OPINION *Page 2 
{¶ 1} Defendant-appellant Exterior Systems, Inc. appeals from the March 14, 2007 Judgment Entry of the Licking County Court of Common Pleas holding that Jason Thatcher, the decedent, demonstrated an entitlement to participate in the benefits provided by the Workers' Compensation Act.
 STATEMENT OF THE FACTS AND CASE {¶ 2} The facts, as stipulated by the parties, are as follows:
 {¶ 3} "1. On January 14, 2003, Robertson Construction, a heating, ventilation and cooling contractor, (`Robertson') was performing work on the construction project at Utica High School, Licking County, Ohio.
 {¶ 4} "2. On January 14, 2003, Robertson cut approximately 4 foot by 4 foot (4' x 4') holes in the roof of the newly constructed building for HVAC duct access.
 {¶ 5} "3. The roof where Robertson cut the holes was approximately twenty (20) feet above the frozen ground.
 {¶ 6} "4. The frozen ground below the 4' x 4' holes in the roof cut by Robertson was uneven and littered with construction debris.
 {¶ 7} "5. At the end of the work day on January 14, 2003, Robertson's employees simply laid sheets of wood over the 4' x 4' holes and did not clearly mark such holes as required by Robertson's safety standards and OSHA requirements.
 {¶ 8} "6. On January 15, 2003 the Decedent, Jason Thatcher, was working as a full time employee of Defendant-Appellant Exterior Systems, Inc. (`Exterior') installing roofing material at the Utica High School construction project. *Page 3 
 {¶ 9} "7. One of Mr. Thatcher's job duties for Exterior was to clear and clean the roof, including the removal of scrap material on the roof where Robertson had cut the 4' x 4' holes, in preparation for Exterior to install roofing material on the project.
 {¶ 10} "8. On the morning of January 15, 2003 the Decedent, Jason Thatcher, fell while at work.
 {¶ 11} "9. No one saw Mr. Thatcher fall. When Mr. Thatcher was found after his fall, the pieces of wood covering the holes cut by Robertson were still covering the holes.
 {¶ 12} "10. The injuries Jason Thatcher sustained by his fall resulted in his death." See Stipulations of Facts filed with the trial court on February 13, 2006.
 {¶ 13} Following the decedent's death, a claim was filed with the Ohio Bureau of Workers' Compensation on behalf of Nathaniel Gusler, the decedent's sole surviving child. The claim initially was allowed as a death claim. After appellant appealed, a District Hearing Officer, following a hearing held on March 13, 2003, vacated the order allowing such claim and denied the same.
 {¶ 14} An appeal was then filed and a hearing was held before a Staff Hearing Officer on May 15, 2003. The Staff Hearing Officer vacated the order of the District Hearing Officer and allowed the claim. Appellant then filed an appeal from the order of the Staff Hearing Officer, but such appeal was denied.
 {¶ 15} Subsequently, appellant filed an appeal with the Licking County Court of Common Pleas. After the parties waived a jury trial, the matter was tried to the bench on April 10, 2006. At trial, the evidence presented to the trial court consisted of two (2) *Page 4 
sets of stipulations,[1] the trial deposition of Dr. Keith Norton, the trial deposition of Dr. Gerald Steinman, several photographs of the construction site and the live testimony of Nathaniel Gusler's mother, Atria Karnofel.
 {¶ 16} The parties, in the first set of stipulations, which was filed on February 1, 2006, stipulated to the authenticity and admissibility of records from Grant Medical Center dated January 15, 2003. The stipulated records from Grant Medical Center stated, in relevant part, that "[t]he patient fell from a standing height. This is a relatively odd presentation" and that the etiology of the decedent's fall was unknown. The medical records also stated, in relevant part, as follows: "Status post fall, questionable seizure, versus metabolic etiology versus cerebral aneurismal rupture."
 {¶ 17} As is stated above, the deposition of Dr. Keith Norton also was provided to the trial court as part of the bench trial. Dr. Norton, who is a forensic pathologist, was the Franklin County Coroner and conducted the autopsy in this case. Dr. Norton, during his deposition, testified that the decedent's immediate cause of death was blunt trauma to the head and that the manner of death was an accident. Dr. Norton testified that, in his report dated March of 2003, he indicated that "the victim allegedly fell" and that the decedent also had blunt trauma to the chest with multiple rib fractures.
 {¶ 18} During his deposition, Dr. Norton testified that he was originally told when he talked to the police that the only two alternatives were that the decedent fell on flat ground from a standing height or that he walked off the side of the roof. Dr. Norton further testified that he later received information[2] that the decedent may have fallen through a hole in the roof and that, based on such information, he wrote a letter dated *Page 5 
May 12, 2003 to appellee's counsel in which he opined that the decedent's injuries were more consistent with falling through an opening in the roof and striking his head on the edge of the hole before falling to the ground below.
 {¶ 19} Dr. Norton, in his letter, stated, in relevant part as follows: " . . . I had said that his injury was from a fall from standing, because my understanding of the alternative was that he had fallen from the edge of a roof. Falling from the edge of a roof would not account for the contrecoup injury to the head. I was not considering the rib fractures and lung injury when I concluded (in talking to the Utica Police, for instance) that his injuries were consistent with the fall from his standing height. In light of the extent of the injuries (to the ribs, the lung, and the head), the fall must have been from a height significantly greater than just his standing height.
 {¶ 20} "In summary, the above described injuries are much more consistent with his walking on a roof, falling though [sic] an opening in the roof, striking his head on the edge of the opening in the roof, and then falling (more than 6 feet or so) to the ground beneath.
 {¶ 21} "Based on the facts presented in the statements Messrs, Disbennet and Wolford, it is my opinion to reasonable degree of medical certainty that the injuries to Jason Thatcher occurred as the result of a fall through a hole in the roof — striking his head on the edge of the hole — followed by a fall of a significant distance (about 13 or 15 feet) to a hard surface (the frozen ground) below."
 {¶ 22} The following is an excerpt from Dr. Norton's deposition testimony:
 {¶ 23} "A The new information allowed me to put things together more thoroughly so that it made more sense, because falling from your own height would not *Page 6 
have been as likely to produce rib fractures and a skull facture in somebody of this young age.
 {¶ 24} "Q. Okay. Can you go through exactly how you made the determination that he actually fell through the hole in the roof?
 {¶ 25} "A. Certainly. Part of it was the fact that there is a contrecoup injury to the brain, that is, there is a bruising on one side of the skull, and the bruising of the brain is on the opposite side. This is a pattern that's been observed when the head is accelerated and hits a fixed object. So this would be something that — and it's accelerated relative to another part of the body. So usually it's from a person standing up, and then, you know, when they're standing up, they fall over and hit their head on something very hard. And it's because their foot is still on a firm, stationary object, that their head is pulled down faster, and the brain ends up falling more slowly than the skull and gets injured on the side opposite to the actual point of impact." Deposition of Dr. Norton at 20-21.
 {¶ 26} During his deposition, Dr. Norton also testified that the decedent would have suffered a blow to the back of his head when he hit a fixed object while falling and that another impact would occur when the decedent hit the frozen ground, causing his ribs to break. According to Dr. Norton. "[it] seems unlikely that someone who was healthy would have broken his ribs in falling from his height." Deposition of Dr. Norton at 25. Dr. Norton further testified that the decedent's heart, liver, gallbladder, kidneys, spleen and pancreas were all donated and that, to be suitable for donation, organs had to be in good to magnificent condition. The following testimony was adduced when Dr. Norton was asked why the decedent's right lung was not donated: *Page 7 
 {¶ 27} "A. The right lung was not donated because there were bruises of the lung with some tearing or super — or lacerations, some tearing of the lung, that made them less than perfect candidates for giving to somebody else.
 {¶ 28} "Q. Do you know where the lung was bruised or torn? Was it the front of the lung? The back of the lung?
 {¶ 29} "A. No, I did not note that, and, yet, that would have — the tearing of the lung usually happens where the ribs are broken, so that would have been on the back in the right.
 {¶ 30} "Q. So does that also lead you to believe that his fall was from greater than standing height?
 {¶ 31} "A. Yes.
 {¶ 32} "Q. I'm sorry. The fact that his ribs are broken and bruised, and it tore the lung?
 {¶ 33} "A. Yes. It would seem unlikely that it would — that all that would happen when you just fell from your standing height, though it is possible if that's your only injury. If all of your weight is concentrated there, it would be possible. It would just be unlikely." Deposition of Dr. Norton at 28.
 {¶ 34} When asked if, while performing the autopsy, he observed any other medical problems or reasons that might have led to the decedent's death, Dr. Norton testified "No" and testified that the cause of the decedent's death was blunt trauma to the head that occurred as the decedent fell through a hole in the roof. He further testified that he had no reason to believe that the decedent had a seizure or passed out prior to his fall. *Page 8 
 {¶ 35} On cross-examination, Dr. Norton testified that is was possible that the decedent had a seizure and that he could not rule a seizure out as a possibility. Dr. Norton further testified that he wrote his May 12, 2003 letter after a meeting he had with the decedents attorneys during which he learned that there might have been a hole in the roof through which the decedent could have fallen. Dr. Norton denied that, in his initial autopsy report, he stated that the decedent had fallen from a standing height.
 {¶ 36} Dr. Gerald Steiman, appellant's expert and a board certified neurologist, testified during his deposition that he reviewed the Grant Medical Center records and the coroner's report prepared by Dr. Norton. Dr. Steiman testified that a fall from a standing height was consistent with what he saw upon his review of the medical records. Based upon the information contained in the records, Dr. Steiman testified that it was a "medically reasonable" explanation that the decedent fell from a standing height. Deposition of Dr. Steiman at 12. Based on the decedent's injuries, Dr. Steiman opined that the decedent fell from a standing height because "If he fell from a 20 feet high or 15 feet high sufficient to crack ribs and hit his head, you would expect to see a lot more in terms of skin abrasions, skin lacerations, things of that nature." Deposition of Dr. Steiman at 14.
 {¶ 37} When asked, Dr. Steiman testified that it was possible that the decedent may have had a seizure. On cross-examination, he testified that he could not say to a reasonable degree of medical certainty or probability that the decedent had a seizure on January 15, 2003 and that he did not know what caused the decedent to fall.
 {¶ 38} Following the bench trial, both parties, at the request of the trial court, filed proposed findings of fact and conclusions of law. *Page 9 
 {¶ 39} As memorialized in a Judgment Entry filed on March 14, 2007, the trial court held that the decedent had demonstrated, by a preponderance of the evidence, an entitlement to participate in the benefits of the Workers' Compensation Act. The trial court further found that the decedent suffered injuries in the course of and arising out of his employment with appellant and that such injuries directly and proximately caused his death. Moreover, the trial court also found that Nathaniel Gusler, the decedent's son, was wholly dependent on his father for financial support.
 {¶ 40} Appellant now raises the following assignment of error on appeal:
 {¶ 41} "THE TRIAL COURT ERRED AS A MATTER OF LAW BY CONCLUDING THAT THE PLAINTIFF-APPELLEE HAS DEMONSTRATED ENTITLEMENT TO PARTICIPATE IN THE BENEFITS PROVIDED BY THE WORKER'S COMPENSATION ACT."
 I {¶ 42} Appellant, in its sole assignment of error, argues that the trial court erred in holding that appellee was entitled to participate in the benefits provided by the Workers' Compensation Act. We disagree.[3]
 {¶ 43} In order to establish a right to participate in the Workers' Compensation Fund, the plaintiff specifically has the burden of proving by a preponderance of the evidence that "a causal connection existed between an employee's injury and his *Page 10 
employment either through the activities, the conditions, or the environment of the employment." Waller v. Mayfield (1988),37 Ohio St.3d 118, 122, 524 N.E.2d 458.
 {¶ 44} An appeal from the Commission to a trial court under R.C.4123.512 regarding a claimant's right to participate in the workers' compensation scheme is a de novo determination of matters of law and fact. Oswald v. Connor (1985), 16 Ohio St.3d 38, 42, citing Swanton v.Stringer (1975), 42 Ohio St.2d 356, 359, 328 N.E.2d 794. Upon further appeal, review of the trial court's decision is limited, and "`[i]f the evidence before that [trial] court is sufficient to support the result reached, [the reviewing] court will not substitute its judgment.'"Oswald, 16 Ohio St.3d at 42, quoting Swanton, 42 Ohio St.2d at 359.
 {¶ 45} The appellate standard of review on manifest weight of the evidence issues in a civil case is whether the record contains some competent, credible evidence in support of the trial court's decision. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. MorrisCo. v. Foley Const. Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus.
 {¶ 46} Upon our review of the evidence, we find that there was sufficient evidence supporting the trial court's decision that appellee had demonstrated an entitlement to participate in the benefits provided by the Workers' Compensation Act. Dr. Norton, the doctor who conducted the autopsy, testified that appellant died of blunt trauma to the head. Dr. Norton testified that he was asked by the police which was more likely-that the decedent walked off the edge of a roof or that he fell from his standing height-and that "at that time, I said that it was more likely that he received injuries by *Page 11 
walking on — falling from a standing position . . . " Deposition of Dr. Norton at 19. He testified that when he spoke with the police, he was only given the above two options. Dr. Norton denied that, in his autopsy report, he stated that "this was a case that involved a fall from standing height."
 {¶ 47} Dr. Norton testified that he later received information that it was possible that the decedent had fallen through a hole in the roof[4] and that, based on such additional information, he revised his opinion. As is stated above, Dr. Norton, in his revised opinion, opined that, based upon the decedent's rib fractures and skull fracture, the decedent fell through a hole in the roof. Dr. Norton opined that the blunt trauma to the decedent's head occurred when he struck his head on the edge of the hole in the roof.
 {¶ 48} Appellant, in its brief, relies on Waller v. Mayfield (1988),37 Ohio St.3d 118, 121, 524 N.E.2d 458 at fn.3. In Waller, the Ohio Supreme Court held that, in workers' compensation cases involving an unexplained injury, the claimant has the burden of eliminating idiopathic causes.[5] Id. at paragraph two of the syllabus. If the claimant is able to prove that the injury was non-idiopathic, "an inference arises that the [injury] is traceable to some ordinary risk, albeit unidentified, to which the employee was exposed on the employment premises." Id. at paragraph three of the syllabus. Appellant now argues that the decedent, in the case sub judice, has failed to eliminate all non-work-related possibilities and that the claim is, therefore, not compensable. Appellant *Page 12 
points out that the physicians from Grant Medical Center, Dr. Norton and Dr. Steiman all agree that the decedent may have had a seizure.
 {¶ 49} However, testimony was adduced at the trial that the decedent was in excellent health and had no history of seizures. Atria Karnofel, the mother of the decedent's son, testified before the trial court that she had known the decedent for fifteen (15) years and was friendly with him at the time of his death. She further testified that she saw or talked to him at least once a week and that the decedent was "in fairly good health" and was very active physically. Trial Transcript at 16. Karnofel also testified that she only remembered the decedent being sick twice-once with chicken pox and the other time with a bad cold. According to Karnofel, the decedent did not have seizures and did not pass out for any reason.
 {¶ 50} Moreover, during his deposition, Dr. Norton testified that the decedent's organs were in good to magnificent shape and were able to be donated. Dr. Norton further testified that while he could not say whether the decedent had a seizure, it was unlikely because the decedent did not have a history of having seizures in the past.
 {¶ 51} During his deposition, Dr. Norton was questioned about possible causes of the decedent's fall and death. He testified that, in performing the autopsy, he did not find any medical problems or reasons that might have led to the decedent's death. He further testified, to a reasonable degree of medical certainty, that the proximate cause of the fall that caused the decedent's death was not the decedent's use of marijuana, cannabinoids, alcohol or ethanol or any controlled substance not prescribed by a doctor. Dr. Norton also testified, to a reasonable degree of medical certainty, that there was no *Page 13 
evidence that the proximate cause of the fall was any medical problem associated with the decedent's heart, lungs, liver, gallbladder, pancreas, kidneys, or spleen.
 {¶ 52} The following testimony was adduced when Dr. Norton was questioned about the possibility that the decedent was unconscious at the time of his fall or had a seizure prior to the same:
 {¶ 53} "Q. Based on your background, education, experience, the autopsy you performed on Mr. Thatcher, and the records you have reviewed, to a reasonable degree of medical certainty is there any evidence that the proximate cause of the fall that caused Jason Thatcher's death was the result of Mr. Thatcher being unconscious at the time of his fall? In other words, did he pass out before the fall itself?
 {¶ 54} "A. No. I have no reason to believe that he would have been unconscious prior to the fall.
 {¶ 55} "Q. Okay. Based on your background, education, experience, the autopsy you performed on Mr. Thatcher, and the records you reviewed, to a reasonable degree of medical certainty is there any evidence that the proximate cause of the fall that caused Jason Thatcher's death was the result of seizure?
 {¶ 56} "A. No. I have no reason to believe that Mr. Thatcher had a seizure prior to his fall. There's no evidence of it.
 {¶ 57} "Q. Based on your background, education, experience, the autopsy you performed on Mr. Thatcher, and the records you have reviewed, to a reasonable degree of medical certainty is there any evidence that the proximate cause of the fall that caused Jason Thatcher's death was the result of anything other than his accidental falling through the hole in a roof? *Page 14 
 {¶ 58} "Mr. Russell: Objection.
 {¶ 59} "Q. (By Mr. Gutentag) Your opinion, Doctor?
 {¶ 60} "A. No. I don't see any reason other than his falling through the roof — for his falling through the roof — no reason for his injuries other than falling through the roof, no.
 {¶ 61} "Q. Okay. And is it your opinion that the fall through the roof and the impact that he sustained falling through the roof, was the cause of his death?
 {¶ 62} "Mr. Russell: Objection.
 {¶ 63} "A. Yes, it is." Deposition of Dr. Norton at 33-34.
 {¶ 64} During his deposition, Dr. Steiman testified that he could not say to a reasonable degree of medical certainty or probability that the decedent had a seizure on January 15, 2003.
 {¶ 65} Based on the foregoing, we find that the trial court, as trier of fact, had sufficient evidence before it eliminating idiopathic causes for the decedent's fall and subsequent death.
 {¶ 66} In short, based upon the evidence before the trial court, we find that the trial court did not err in finding that appellee demonstrated, by a preponderance of the evidence, an entitlement to participate in the benefits provided by the Workers' Compensation Act. We find that appellee demonstrated that the decedent suffered injuries in the course and scope of his employment with appellant and that such injuries directly and proximately caused his death. We note that the parties do not dispute that Nathaniel Gusher was wholly dependent upon the decedent, his father. *Page 15 
 {¶ 67} Appellant's sole assignment of error is, therefore, overruled.
 {¶ 68} Accordingly, the judgment of the Licking County Court of Common Pleas is affirmed.
 Edwards, J. Farmer, P.J. and Delaney, J. concur *Page 16 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Licking County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] The one set of stipulations was the Stipulation of Facts filed on February 13, 2006.
[2] The information Dr. Norton refers to are the statements of two men who were working with the decedent on the date of the accident which were signed on May 10, 2003. Their statements were not in evidence.
[3] Appellant, in its brief, urges that the trial court erred by failing to consider all the submissions made by the parties. Appellant notes that while the trial court, in its entry, indicated that appellee filed proposed findings of fact and conclusions of law and that the same were responded to by appellants, both parties filed proposed findings of fact simultaneously. Appellant also notes that the trial court in its entry, did not indicate that it considered appellant's reply to appellee's proposed findings. However, we find no evidence that the trial court did not consider all of the parties' filings.
[4] We note that appellant did not object to the admission of such information, which was also considered by the Staff Hearing Officer.
[5] For Workers' Compensation purposes, the term "idiopathic" refers to an employee's pre-existing physical weakness or disease which contributes to the accident. See Waller v. Mayfield (1988),37 Ohio St.3d 118, 121, 524 N.E.2d 458, 461, fn. 3. *Page 1